## THE WYANOKE.[1]

### THE RUTH DARLING.

### BUCK et al. v. THE WYANOKE.

*(District Court, S. D. New York. November 9, 1889.)*

1. COLLISION—FOG—DUTY OF STEAMER TO REVERSE.
   A steamer, navigating in a dense fog, at night, on the open sea, at the rate of from seven to ten knots per hour, being two-thirds her full speed, heard voices nearly ahead, indicating the proximity of another vessel. *Held*, that it was her duty to reverse, as well as stop, her engines, and not to alter her helm without reversing, until the location and direction of the other vessel was ascertained with certainty. *Held, also*, that she was in fault for ringing up full speed again after once stopping, without reasonable assurance that the danger was past.

2. SAME—SAILING VESSEL—MECHANICAL FOG-HORN.
   A sailing vessel is bound to have, and use in a fog, mechanical means for sounding her fog-horn.

3. SAME—SPEED OF SAILING VESSEL.
   Six knots is immoderate speed for a sailing vessel, under nearly full sail, in a dense fog, at night.

4. SAME—SPEED OF STEAMER.
   Seven knots, in a dense fog, at night, is immoderate speed for a steamer whose full speed is only ten or eleven knots.

In Admiralty. Action for damages by collision.
*Carter, Rollins & Ledyard*, for libelants.
*Biddle & Ward*, for claimants.

[1] Reported by Edward G. Benedict, Esq., of the New York bar.

BROWN, J. The above libel was filed to recover for the loss of the schooner Ruth Darling and her cargo in a collision with the side-wheel steamer Wyanoke, off Cape May, in a fog, at about 2:15 A. M. of March 28, 1889. The steamer's stem struck the schooner on the starboard side a little forward of the main rigging, breaking a hole in her side, from which the schooner speedily sank. Her captain and two men were on deck at the time. The lookout only was saved. The other two were lost. Two men who were below also escaped. Until a few minutes before the collision the steamer, bound from New York, was making a course of S. S. W. The schooner, bound from the West Indies to New Haven, having the wind to the southward and a little variable, was sailing wing and wing, making a course from N. to N. by E., and crossing the course of the steamer, therefore, by an angle of about one or two points. About 15 minutes before the collision the vessels ran into a bank of fog, so dense that other vessels or lights could be seen only a short distance. The lookout of the schooner testifies that the first thing he heard was the sound of a whistle; that soon after he first saw the steamer's mast-head light; the next instant a green light, "a little bit on his starboard bow,—just enough to say on her starboard bow;" that between hearing the whistle and seeing the light "there was just time enough to blow one blast of the horn," and "when the lights were first seen the vessels were about half a ship's length away;" that he had heard no previous whistle; that he sung out, "Hard a-port," but the captain ordered, "Hard a-starboard;" that he had previously given six or seven signals on the horn of three blasts each, from one to two minutes apart, as near as he could guess; that the horn had no bellows or mechanical appliances for blowing, and had some holes near the mouth piece stopped up with soap.

The steamer, before running into the fog, was under full speed of about ten or eleven knots. Soon after entering the fog, she commenced giving fog signals, and was put under one bell, which, according to the engineer's testimony, would give nearly two-thirds the number of revolutions that full speed gives. That would make her speed at the rate of about seven knots. The master, coming into the pilot-house, ordered full speed. Very soon voices were heard, which he thought were on the port bow, but which the lookout located ahead or about ahead. The master thereupon stopped the engine. Listening for the voices, and not hearing them, he says he supposed they had gone by, and again gave the order, "full speed," and ported. Almost immediately after, as he says, he saw the schooner's green light on his port bow, and then rang four bells and a jingle bell to stop and back strong. No fog horn from the schooner was heard. The master heard voices twice, at an interval, as he judges, of some ten seconds. He estimated the time between hearing the voices first and the collision at two minutes, and between hearing the voices the second time and ordering the wheel to port at about half a minute.

Considering the fact that, though voices were heard, the horn was blown every one or two minutes, and was not heard, it is hardly probable that the interval between hearing the voices first and the collision was as much as two minutes. It was natural that the steamer's lights should be seen sooner than the schooner's. The fact that the collision

was nearly at right angles shows that the combined changes of the two vessels amounted to from four to six points. From the testimony on both sides it is probable that each of the vessels contributed about equally to this change. The testimony of the lookout of the schooner is explicit that the steamer's lights were first seen a little on his starboard bow. There is no reason to discredit this testimony, as it is reconcilable and consistent with the steamer's testimony, if the schooner be located at first a little to the westward of the line of the steamer's course, and if the schooner's green light was first seen on the steamer some time afterwards, (as the testimony in fact shows,) and after the steamer, by porting, had brought the schooner's light a little on her port bow. That view, and no other, so far as I can perceive, reconciles the testimony of the two vessels; and such, I think, must be held to be the facts. The captain estimates his speed at the time of the collision at two knots. It is probable that the vessels were not more than a quarter of a mile apart when the steamer's lights were first seen, and that the interval between that and the collision was not over a minute.

If the situation was as stated above, it follows that there would have been no collision had the vessels kept their courses, and neither changed until the heading of the other was known. Upon the above facts, therefore, both vessels must be held to blame for non-observance of the rules of navigation;—the schooner, for having no mechanical means for sounding her fog-horn, (*The Love Bird*, L. R. 6 Prob. Div. 80,) and for going at the immoderate speed of six knots, having nearly all her canvas set, and being therefore at nearly full speed, (as the wind then was,) in a dense fog; the steamer, for going at too great speed, —nearly seven knots;—for ringing up "full speed" very soon after voices had been heard nearly ahead, without any reasonable assurance that the danger was past; for not reversing, as well as stopping, her engines, when voices were heard nearly ahead, (which must have been known to be very near,) until the location and direction of the other vessel were ascertained with certainty; and for changing her helm, by porting, under such circumstances, without at the same time reversing, as required by article 18 of the rules of navigation. I can hardly imagine circumstances in which reasonable prudence would more urgently demand a reversal of the engines, in order that the vessel might be brought to a stand-still as soon as possible, than where a vessel's speed is two-thirds her full speed, and voices are heard, nearly ahead, in a dense fog, before the other vessel or her lights can be seen. The uncertainties as to the source of sounds in a fog equally demand that no change of course should be made, under such circumstances, unless accompanied by reversing. *The Lepanto*, 21 Fed. Rep. 651, 659, and cases cited; *The Pottsville*, 24 Fed. Rep. 655; *The Frankland*, L. R. 4 P. C. 529; *The Dordogne*, L. R. 10 Prob. Div. 6, 9; *The Britannic*, 39 Fed. Rep. 395, 399. See *The Vindomora*, L. R. 14 Prob. Div. 172. Had the legal rules in either of the above respects been observed, it is not probable that the collision would have occurred. Each fault was therefore material, and the damages must accordingly be divided. If not agreed on, a reference may be taken to a commissioner.